No. 21-1616

---

IN THE
### United States Court of Appeals for the Fourth Circuit

---

THOMAS KRAKAUER,
on behalf of a class of persons,

*Plaintiff-Appellee,*

*v.*

DISH NETWORK L.L.C.,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Middle District of North Carolina
No. 1:14-cv-00333-CCE-JEP,
Hon. Catherine C. Eagles

---

**PAGE PROOF OPENING BRIEF FOR DEFENDANT-
APPELLANT DISH NETWORK L.L.C.**

---

E. Joshua Rosenkranz
Peter A. Bicks
Elyse D. Echtman
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

Eric A. Shumsky
Sarah H. Sloan
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1152 15th Street
Washington, DC 20005
(202) 339-8400

Paul David Meyer
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700

*Counsel for Defendant-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-1616__     Caption: __Thomas Krakauer v. DISH Network L.L.C.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__DISH Network L.L.C.__
(name of party/amicus)


who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.  Does party/amicus have any parent corporations?  ☑ YES ☐ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

    DISH Network L.L.C. is a wholly owned subsidiary of DISH DBS Corporation, a corporation with publicly traded debt. DISH DBS Corporation is a wholly owned subsidiary of DISH Orbital Corporation. DISH Orbital Corporation is a wholly owned subsidiary of DISH Network Corporation, a corporation with publicly traded equity (NASDAQ: DISH).

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☑ YES ☐ NO
    If yes, identify all such owners:

    Based solely on a review of Form 13D and Form 13G filings with the Securities and Exchange Commission, no entity owns more than 10% of DISH Network Corporation's stock other than Telluray Holdings, LLC and Dodge & Cox.


- 1 -

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Eric Shumsky       Date: 8/9/2021

Counsel for: DISH Network L.L.C.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES .................................................................iii

INTRODUCTION .................................................................. 1

JURISDICTION .................................................................. 3

STATEMENT OF THE ISSUE .................................................. 3

STATEMENT OF THE CASE .................................................. 3

    Krakauer Sues DISH Under The TCPA, Which Creates A
        Private Right Of Action For Telemarketing Violations ......... 3

    The District Court Addresses Class Certification And DISH's
        Liability, But Defers Until The Claims Process The
        Question Of Who Received Calls ........................................... 6

    The District Court Initially Declines To Enter Judgment
        Against DISH But Then Reverses Course During The
        Claims Process ...................................................................... 8

    In Post-Judgment Proceedings, Thousands of Call Recipients
        Cannot Be Determined ........................................................ 11

    The Court Awards Unclaimed Funds Cy Pres To Uninjured
        Third Parties ........................................................................ 13

SUMMARY OF ARGUMENT ................................................ 15

STANDARD OF REVIEW ...................................................... 18

ARGUMENT .......................................................................... 19

    I.    The District Court Improperly Gave Nearly $11 Million
        In Unclaimed Judgment Funds To Uninjured Third
        Parties With No Legal Claim ............................................. 19

        A.    This Court has held it "illegal" to distribute
            damages to uninjured non-parties ............................. 21

i

B.    The district court's award of judgment funds to uninjured non-parties violates the Constitution and federal law............................................................25

   1.    The *cy pres* awards violate Article III. ...............25

   2.    The *cy pres* awards violate the separation of powers, the TCPA, and the Rules Enabling Act. ...................................................29

C.    Cases permitting *cy pres* awards in class settlements do not apply to litigated judgments.........34

CONCLUSION ........................................................................39

ORAL ARGUMENT STATEMENT

CERTIFICATE OF COMPLIANCE

ADDENDUM OF STATUTES AND REGULATIONS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agent Orange Prod. Liab. Litig.*,
   818 F.2d 179 (2d Cir. 1987) ............................................................. 37

*In re Airline Ticket Comm'n Antitrust Litig.*,
   307 F.3d 679 (8th Cir. 2002) ........................................................... 21

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ........................................................................ 30

*Allapattah Servs., Inc. v. Exxon Corp.*,
   157 F. Supp. 2d 1291 (S.D. Fla. 2001) ............................................. 9

*Allapattah Servs., Inc. v. Exxon Corp.*,
   No. 91-0986-CIV, 2006 WL 1132371 (S.D. Fla. Apr. 7,
   2006) .................................................................................................. 9

*Am. Int'l Pictures, Inc. v. Price Enters., Inc.*,
   636 F.2d 933 (4th Cir. 1980) ..................................................... 24, 25

*Am. Legion v. Am. Humanist Ass'n*,
   139 S. Ct. 2067 (2019) .................................................................... 27

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997) ........................................................................ 33

*In re Baby Prods. Antitrust Litig.*,
   708 F.3d 163 (3d Cir. 2013) ....................................................... 34, 37

*Barnet v. Muncie Nat'l Bank*,
   98 U.S. 555 (1878) .......................................................................... 30

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ........................................................................ 27

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) ........................................................... 33

*Carrera v. Bayer Corp.,*
   727 F.3d 300 (3d Cir. 2013) ............................................................ 34

*Casillas v. Madison Ave. Assocs., Inc.,*
   926 F.3d 329 (7th Cir. 2019) .......................................................... 26

*Cimino v. Raymark Indus., Inc.,*
   151 F.3d 297 (5th Cir. 1998) .......................................................... 38

*City of Philadelphia v. Am. Oil Co.,*
   53 F.R.D. 45 (D.N.J. 1971) ............................................................ 36

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ...................................................................... 30

*Democratic Cent. Comm. of D.C. v. Washington Metro. Area
   Transit Comm'n,*
   84 F.3d 451 (D.C. Cir. 1996) ......................................................... 22

*Eisen v. Carlisle & Jacquelin,*
   479 F.2d 1005 (2d Cir. 1973) .......................................... 22, 23, 24, 36

*Holtzman v. Turza,*
   828 F.3d 606 (7th Cir. 2016) .......................................................... 31

*Holtzman, C.P.A. v. Turza,*
   728 F.3d 682 (7th Cir. 2013) .......................................................... 27

*Kennon v. Gilmer,*
   131 U.S. 22 (1889) ........................................................................ 38

*Klier v. Elf Atochem N. Am., Inc.,*
   658 F.3d 468 (5th Cir. 2011) ..................................................... 26, 35

*Krakauer v. Dish Network, L.L.C.,*
   925 F.3d 643 (4th Cir. 2019) ................................................. 4, 11, 31

*Late Corp. of the Church of Jesus Christ of Latter-Day Saints
   v. United States,*
   136 U.S. 1 (1890) ......................................................................... 21

iv

*Lewis v. Casey*,
    518 U.S. 343 (1996)...................................................................26

*Leyse v. Bank of Am. Nat'l Ass'n*,
    804 F.3d 316 (3d Cir. 2015) ...................................................31

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
    478 U.S. 501 (1986)...................................................................37

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...................................................................26

*Marek v. Lane*,
    571 U.S. 1003 (2013)................................................................36

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) ...................................................22

*Meghrig v. KFC Western, Inc.*,
    516 U.S. 479 (1996)...................................................................30

*Mirfasihi v. Fleet Mortg. Corp.*,
    356 F.3d 781 (7th Cir. 2004)...................................................36

*Nachshin v. AOL, LLC*,
    663 F.3d 1034 (9th Cir. 2011)...............................21, 34, 35

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
    414 U.S. 453 (1974)...................................................................30

*Parchman v. SLM Corp.*,
    896 F.3d 728 (6th Cir. 2018)...................................................31

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    588 F.3d 24 (1st Cir. 2009) .....................................................37

*Ross v. Bernhard*,
    396 U.S. 531 (1970)...................................................................38

*Sloane v. Equifax Info. Servs., LLC*,
    510 F.3d 495 (4th Cir. 2007)...................................................38

*Smith v. Moore,*
   343 F.2d 594 (4th Cir. 1965)............................................................ 21

*Spokeo, Inc. v. Robbins,*
   136 S. Ct. 1540 (2016)................................................................... 27

*Thorn v. Jefferson-Pilot Life Ins. Co.,*
   445 F.3d 311 (4th Cir. 2006)........................................................ 18

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021).................................... 1, 26, 27, 28, 29

*Tyson Foods, Inc. v. Bouaphakeo,*
   557 U.S. 442 (2016).............................................................. 26, 34

*United States v. DISH Network, LLC,*
   No. 3:09-3073 (C.D. Ill.) ............................................................ 32

*Van Gemert v. Boeing Co.,*
   573 F.2d 733 (2d Cir. 1978) ...................................................... 36

*Van Gemert v. Boeing Co.,*
   739 F.2d 730 (2d Cir. 1984) ...................................................... 28

*Williams v. Big Picture Loans, LLC,*
   929 F.3d 170 (4th Cir. 2019)...................................................... 18

*Windham v. Am. Brands, Inc.,*
   68 F.R.D. 641 (D.S.C. 1975)................................................. 23, 25

*Windham v. Am. Brands, Inc.,*
   565 F.2d 59 (4th Cir. 1977).................................................. 2, 22, 23

## Constitutional Provisions

U.S. Const. art. I, § 1................................................................ 30

U.S. Const. art. III.................................1, 2, 17, 26, 27, 28, 29, 32, 33

U.S. Const. amend. VII ....................................................... 18, 38, 39

**Statutes**

28 U.S.C. § 1291 ...................................................................... 3

28 U.S.C. § 1331 ...................................................................... 3

28 U.S.C. § 1332(d)(2) ............................................................ 3

28 U.S.C. § 2072(b) ............................................................... 33

47 U.S.C. § 227(c)(3) ............................................................... 4

47 U.S.C. § 227(c)(5) .......................................................... 4, 31

47 U.S.C. § 227(g)(1) ............................................................ 31

**Rules**

Federal Rule of Civil Procedure 23 .......................2, 15, 17, 24, 32, 33, 34

Federal Rule of Civil Procedure 54(a) ....................................... 3

**Other Authorities**

137 Cong. Rec. S16, 205-06 (daily ed. Nov. 7, 1991) ................................ 5

2 McLaughlin on Class Actions § 8:16 (17th ed.) ................................... 36

15B Charles Allan Wright & Arthur R. Miller, Federal
    Practice & Procedure § 3916 (2d ed. 2021) ........................................ 3

Martin H. Redish et al., *Cy Pres Relief and the Pathologies of
    the Modern Class Action: A Normative and Empirical
    Analysis*, 62 Fla. L. Rev. 617 (2010) ...................................... 20, 21, 32

Newberg § 12:32 ...................................................................... 35

## INTRODUCTION

Following trial, the jury in this case held DISH liable for calls made by one of its retailers in violation of the Telephone Consumer Protection Act (TCPA), and this Court affirmed that determination of liability. During the ensuing post-judgment proceedings, however, for thousands of the violative phone calls, no call recipient was identified or came forward. In our adversarial system, the consequence of that crucial gap should be clear: Without an injured individual, there is no compensable claim, and the defendant has no legal obligation to pay. After all, as the Supreme Court just reaffirmed, "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021).

The district court, however, disagreed. It had extra judgment funds on hand because it had required DISH to deposit enough money into the court's registry to cover the judgment if a valid claimant came forward for *every* violative phone call. And the court thought it unfair to return the unclaimed funds to DISH. So, operating through a special

master, the court invited third-party organizations to apply to receive the unclaimed judgment funds. These were strangers to the litigation who had suffered no injury. Then, invoking the doctrine of *cy pres*, the court decided to dole out nearly $11 million in judgment funds—money that DISH had deposited with the court to satisfy the judgment in favor of prospective class members—to twelve such organizations.

By doing so, the district court erred as a matter of law multiple times over. Awarding funds to uninjured non-parties violates basic principles of Article III standing. It also violates the separation of powers by inventing a remedy that Congress did not provide. It runs afoul of this Court's command that such a fluid recovery is "illegal … and wholly improper." *Windham v. American Brands, Inc.*, 565 F.2d 59, 72 (4th Cir. 1977). And, by treating class actions as exempt from these core restraints, the district court also violated the Rules Enabling Act. Under that statute, the Federal Rules—including Rule 23—cannot expand substantive rights. Because there can be no compensable claim when no injured plaintiff is identified in an individual lawsuit, the same must be true in a class action.

For all of these reasons, this Court should vacate the district court's order distributing unclaimed funds to third parties, and order that those funds be returned to DISH.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1332(d)(2). This Court has jurisdiction under 28 U.S.C. § 1291 because the order disposing of unclaimed funds is a final judgment that concludes that process and the post-trial claims process generally. Fed. R. Civ. P. 54(a); *see* 15B Charles Allan Wright & Arthur R. Miller, Federal Practice & Procedure § 3916 (2d ed. 2021) ("final judgment appeal should be available upon conclusion of most post-judgment proceedings").

## STATEMENT OF THE ISSUE

Did the district court err as a matter of law by distributing judgment funds to uninjured non-parties?

## STATEMENT OF THE CASE

### *Krakauer Sues DISH Under The TCPA, Which Creates A Private Right Of Action For Telemarketing Violations*

"Congress enacted the [TCPA] to prevent abusive telephone marketing practices. As part of this effort, the TCPA prohibits calls to

numbers on the national Do-Not-Call registry." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 648 (4th Cir. 2019) (*Krakauer I*).  The Do Not Call Registry is a database—"a list of telephone numbers of residential subscribers who object to receiving telephone solicitations." 47 U.S.C. § 227(c)(3).  (The Registry, however, does not include the names of the telephone subscribers who chose to place their numbers on it.)  Individuals may assert a "private right of action" under the TCPA if they "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the" Registry.  47 U.S.C. § 227(c)(5).  A successful plaintiff may "recover for actual monetary loss from such a violation, or … receive up to $500 in damages for each such violation."  47 U.S.C. § 227(c)(5)(B).  The statute also authorizes treble damages for willful or knowing violations.  47 U.S.C. § 227(c)(5).

This law "empowers each person to protect his own personal rights," and "affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer I*, 925 F.3d at 650.  To that end, Congress designed the substantial damages available under the TCPA to provide sufficient financial

4

incentive for individuals to bring actions in small claims court. 137 Cong. Rec. S16,205-06 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings). Many individual claims, however, now are combined in class actions.

In April 2014, Thomas Krakauer sued DISH under the TCPA. JA__**[Doc.1; Doc.32]** (First Amended Complaint). He contended that a DISH retailer (SSN) made more than 50,000 calls promoting DISH services to approximately 20,000 numbers on the Do Not Call Registry. JA__**[Doc.32at6-7; Doc.48-2at11-12]**. Krakauer sought to represent a class of "[a]ll persons … whose [landline] telephone numbers were listed on the [Registry] for at least 30 days, but who received telemarketing calls from [SSN], to promote [DISH] from May 1, 2010 to August 1, 2011." JA__**[Doc.47at1]** (class-certification motion); *see also* JA__**[Doc.338at4 n.3]** (reflecting that the start of the class period changed to May 11, 2010). The class, Krakauer explained, would comprise "some twenty thousand people who, like him, took the affirmative step of getting on the [Registry], but received repeated calls from SSN marketing DISH TV products anyway." JA__**[Doc.48at6]**.

Krakauer requested that he "and all class members be awarded $500 in statutory damages for each violation of the TCPA," and "$1500 for each willful or knowing violation of the TCPA."  JA__**[Doc.32at14]**.

### *The District Court Addresses Class Certification And DISH's Liability, But Defers Until The Claims Process The Question Of Who Received Calls*

An issue from the outset was how Krakauer would reliably identify class members.  Identifying the *phone numbers* called by the DISH retailer, SSN, was easy enough; that information was contained in the records of the company that provided SSN's dialing software.  JA__**[Doc.351at2]** (claims-administration order).  But identifying the call *recipients*—i.e., potential class members—was a different story.  Krakauer never attempted, for instance, to subpoena phone records directly; instead, he proposed to rely on two databases maintained by third parties.  But neither database identifies who answers a call, or otherwise suffers an intrusion on their privacy.  Indeed, they do not even identify who the phone-line subscriber is.  Instead, these databases identify names "associated with" a given phone number,[1] for

---

[1] JA__**[Doc.351at2]** (claims-administration order); JA__**[Doc.111at11]** (class-certification order); JA__**[Doc.382-2at5]** (declaration of plaintiff's expert).

instance by harvesting names from "thousands of [different] sources" like credit-card applications, JA__**[Doc.48-2at5 n.2; Doc.304at12, 15-16, 71]**.  As a result, DISH's expert explained, many phone numbers in the records were "associated with multiple names," JA__**[Doc.56-12at16]**, and other phone numbers were associated with no name at all, JA__**[Doc.351at2]**.

The district court certified Krakauer's proposed class, using Krakauer's proposed class definition, but it did not explain how Krakauer's data could identify call recipients.  *See* JA__**[Doc.111]**.  The court also did not require Krakauer to establish at trial who "received" the calls; on the contrary, it explicitly "remove[d] from the upcoming trial any issues as to whether a particular phone number is associated with a particular person" on the theory that "[s]uch issues are not conducive to a class-wide trial and can be resolved post-trial using procedures to be determined later."  JA__**[Doc.242at1]** (order concerning issues for trial).

At trial, the jury found DISH liable for 51,119 calls that SSN made to 18,066 residential landline phone numbers on the Do Not Call Registry.  JA__**[Doc.292at1]** (verdict).  The jury "issued a per-violation

damages award," JA__**[Doc.351at13]**, of $400 to each of the 18,066

phone numbers, JA__**[Doc.292at2]**.  The district court then trebled that

award to $1,200 per call.  JA__**[Doc.338]**.  Thus, any class member who

eventually could show that they had the requisite relationship to one of

those phone numbers stood to receive at least $2,400 (because a TCPA

claim requires receiving two calls), minus attorneys' fees and expenses.

Some putative class members stood to recover over $20,000.  *See, e.g.*,

JA__**[Doc.560-1; 560-2; 560-3]** (lists of purported class members

entitled to payment).

### *The District Court Initially Declines To Enter Judgment Against DISH But Then Reverses Course During The Claims Process*

Both during and after trial, the district court recognized that an

aggregate class judgment was inappropriate given that the case

involved individual claims and individual awards.  During trial, for

instance, the district court recognized there would need to be "posttrial

proceedings" to "figure out … who gets the money."

JA__**[Jan.17,2017TrialTr.at159]**.  And shortly after trial, the court

explained that "Dish has an interest in not paying damages to persons

who are not proper class members, which aligns with the Court's

interest in insuring that only class members receive damages awards."

JA\_\_**[Doc.351at14]**; *see also* JA\_\_**[Doc.351at10]** ("Like Dish, the Court is interested in insuring that only class members receive the damages awarded by the jury."). "As a matter of fairness and 'basic due process,'" the court explained, "in a class action not resolved by settlement, a defendant who will ultimately pay damages to class members has a right to participate in claims administration and 'to object and oppose any unfounded or incorrect claim.'" JA\_\_**[Doc.351at14]** (quoting *Allapattah Servs., Inc. v. Exxon Corp.*, 157 F. Supp. 2d 1291, 1324 (S.D. Fla. 2001)).

Given those considerations—and given that the jury had awarded damages for each violative phone call, rather than in one lump sum for the class as a whole—the district court declined Krakauer's request to enter a class-wide judgment. *See* JA\_\_**[Doc.351at14-15]**. Instead, the court instituted a claims-administration process "to determine whether a claimant is the proper owner of the interest in the damage award." JA\_\_**[Doc.351at9]** (quoting *Allapattah Servs., Inc. v. Exxon Corp.*, No. 91-0986-CIV, 2006 WL 1132371, at *3 (S.D. Fla. Apr. 7, 2006)).

Seven months later—midstream in the claims process—the district court shifted course. The court expressed frustration with

DISH's contesting of Krakauer's purported identification of class members, and asserted "that the time has come to enter judgment in favor of the class" to facilitate "appellate review of all decisions related to liability." JA__**[Doc.438at1-2]**. The court calculated the amount of the judgment by multiplying the individual award per call ($1,200) by the number of violative calls (51,119) to obtain a total of $61,342,800. The court entered judgment in that amount. JA__**[Doc.438; Doc.439]**. However, it did not identify any individual (other than Krakauer) entitled to recover. Instead, it attached to the judgment a list of the 18,066 telephone numbers on the Do Not Call Registry that DISH's retailer had called. JA__**[Doc.439at1]**. That list of phone numbers, the court said, "describes the … class members." *Id.*

On the same day the district court entered judgment to facilitate an immediate appeal on liability, the court issued an order governing the "claims process" through which "remaining questions as to distribution of the damages award" would be "resolved." JA__**[Doc.438at2-3]**. Relevant here, the order provided that the court would not decide how to "dispos[e] of any undisbursed funds" until after

both a final order disbursing funds to class members and full briefing on the issue.  JA___**[Doc.441at10-11]**.

As the district court envisioned, DISH appealed.  This Court affirmed class certification and liability.  *Krakauer I*, 925 F.3d 643.  DISH then deposited the full amount of the judgment into the district court's registry.

### *In Post-Judgment Proceedings, Thousands of Call Recipients Cannot Be Determined*

During and after DISH's appeal, the claims process continued.  *See* JA___**[Doc.478at2; Doc.515at3]**.  The district court identified 11,239 individuals as eligible to recover based on commercial databases that showed they were "associated with" phone numbers that were called.  *See* JA___**[Doc.441at1-2; Doc.475; Doc.560at3; Doc.620at2]**.  The district court did not require those individuals to submit claim forms or otherwise attest that they actually received the calls at issue.  For the remaining 6,827 phone numbers at issue, the district court did require individuals to submit claim forms to determine class

membership.  *See* JA__**[Doc.441at6-10; Doc.515at2-3]**.[2]  Ultimately, only 1,958 valid claim forms were submitted.  *See* JA__**[Doc.536at1]**. Thus, for 4,869 phone numbers, no class member could be identified, even under the district court's relaxed standard for who counts as a class member.  *See* JA__**[Doc.620at2-3]**.

On February 13, 2020, the district court entered an order disbursing funds to identified class members.  JA__**[Doc.560at1]**.  The court acknowledged that it had "yet to decide how to dispose of unclaimed or undisbursed funds."  JA__**[Doc.560at5]**.[3]

---

[2] The claim form asked whether "you or someone in your household ha[d] this telephone number" during the class period, not whether the claimant herself actually received any of the calls.  JA__**[Doc.361at3]**.

[3] DISH sought to appeal the final disbursement order at the culmination of claims administration, on the grounds that the databases and claim forms on which the district court relied to identify class members were incapable of identifying, and did not purport to identify, the persons who actually received the phone calls. JA__**[Doc.562]**.  Krakauer moved to dismiss the appeal as "too early" on the theory that the claims-administration process was "still underway" and would "conclude only when the district court issues a final order disposing of any unclaimed funds."  Motion to Dismiss at 2, No. 20-1077, Doc. 40.  This Court agreed.  Order Granting Motion to Dismiss at 2, No. 20-1077, Doc. 50.  After the appeal was dismissed, over DISH's objection, the district court lifted its stay and began the process to disburse the class funds to the identified class members. JA__**[Doc.628]**.  This Court likewise declined to stay those disbursements.  Doc. 10.  Those disbursements will begin imminently,

### The Court Awards Unclaimed Funds Cy Pres To Uninjured Third Parties

On October 27, 2020, the district court issued an interlocutory order in which it began to consider how to dispose of any judgment funds that go unclaimed. The court asserted that it had "broad discretion" to distribute those funds "within the general equitable powers of the court." JA__**[Doc.590at4]**. It reasoned that it would be inappropriate for the funds to revert to DISH or be subject to state escheat law. JA__**[Doc.590at1]**. However, the court did not actually resolve how unclaimed funds *would* be disposed of. To answer that question, the court appointed a special master to "evaluate potential *cy pres* recipients so that the Court [could] make an appropriate decision between federal escheat and *cy pres*." *Id.*

The special master then "solicit[ed] applications," JA__**[Doc.617at4]**, from third parties who might like to receive a portion of the unclaimed judgment funds—nearly $11 million that DISH had paid into the court's registry as part of the judgment fund for

---

and are likely to be completed before this appeal is resolved. Accordingly, with no effective way to recoup those funds even if it prevails on appeal, DISH has not challenged those disbursements here.

potential plaintiffs.  The special master created "an online fillable application" that any interested organization could complete.  JA__**[Doc.617at4]**.  Those third parties, which had no relationship to the litigation, would submit a budget for a "project" to "further the purposes of the" TCPA.  JA__**[Doc.617-2at5-6]**.  The special master directly solicited applications from some organizations, and those organizations further "distribute[d] the notice to their appropriate email networks."  JA__**[Doc.617at4]**.  The special master received thirty-eight applications and recommended giving money to twelve organizations, ten of which the special master had solicited directly.  JA__**[Doc.617at6-7; Doc.617-1]**.

On April 29, 2021, the district court issued its final decision regarding the disposition of unclaimed funds.  It divided up unclaimed judgment funds among the third-party organizations that the special master had identified: e.g., $1,000,000 for Consumer Reports to "educate consumers to protect their own data," JA__**[Doc.617at28-29]**; $675,000 for San Francisco Consumer Action, whose "project" entails providing TCPA advice, JA__**[Doc.617at17-18]**; $1,708,810 for the National Consumer Law Center to hire attorneys focused on the TCPA,

JA__**[Doc.617at16-17]**; $254,223 for Columbia University's Department of Computer Science, which proposes to develop techniques "to identify and block illegal and unwanted calls," JA__**[Doc.617at19]**; and so on. JA__**[Doc.617at11-30; Doc.620at11]**.

This order marked the final resolution of the unclaimed-funds issue, as well as post-judgment proceedings as a whole. JA__**[Doc.620]**. DISH timely appealed. JA__**[Doc.629]**.

## SUMMARY OF ARGUMENT

I.    A civil action between individual plaintiffs and individual defendants is governed by foundational requirements rooted in the Constitution. To recover, a plaintiff has to show that their legal rights were violated and that they suffered concrete injury. If a plaintiff does so, then they—and only they—have a claim to damages. Strangers to the action, by contrast, have no claim. Those principles apply with equal force in a class action; Rule 23 does not and cannot change underlying substantive law. And if liability is established, then just as in an individual action, it is *only* the plaintiffs—the class members— who have a claim to damages. The judgment is not an equitable pot of money for the court to distribute to any third parties it deems

15

deserving.  The district court here committed legal error when, without DISH's agreement, it awarded judgment funds to uninjured third parties.

A.     The district court's award violates this Court's precedent holding that it is "illegal … and wholly improper" to use methods like *cy pres* to award class funds to uninjured parties where no valid claimant exists.  For thousands of violative phone calls, no injured party has come forward.  No individual has asserted they were the call recipient, and the funds associated with those calls are unclaimed.  The appropriate disposition of those funds is clear:  Where no injured individual makes a claim, there is simply no claim to be compensated, and the funds must revert to the defendant.  Indeed, in the ordinary *individual* action in which no plaintiff makes a claim, the defendant would not have paid out funds in the first place, so the court would have no cause to be disposing of funds at all.  Here, however, the district court improperly invoked "*cy pres*" to award these funds to uninjured third parties that have nothing to do with the litigation.

B.     The *cy pres* awards also violate constitutional and statutory limits by awarding judgment funds to uninjured parties who have no

valid claim. Under Article III, federal courts may provide relief only to individuals who show that they suffered a concrete legal injury traceable to the defendant's actions. And the damages awarded must be capable of redressing the individual injury. Awarding damages to a third party who has not suffered, and will not suffer, actual harm, violates these constitutional rules.

Furthermore, by rewriting the statute to allow new classes of claimants to recover, the district court violated the separation of powers. When Congress enacted the TCPA, it created a "private right of action" for individuals who receive two or more calls despite listing their phone numbers on the Do Not Call Registry. Only such an individual has a constitutional and statutory right to recover. The judiciary cannot expand who is eligible to recover. The fact that this is a class action does not change that rule. Under the Rules Enabling Act, Rule 23 cannot change substantive law at all, and certainly it cannot abridge this basic constitutional principle.

C.    Even if *cy pres* were an appropriate way to distribute funds that go unclaimed after a class action *settlement*, it has no place in the context of a litigated judgment. Following a judgment, there is a jury

17

verdict that must be honored. It is not a settlement fund—with distributions consented to by both parties—that might be analogized to trust funds to distribute. Instead, there are individual awards that may go only to the individuals who were injured. Therefore, extending *cy pres* to a litigated judgment, unlike a settlement, would independently violate the Seventh Amendment. The jury instructions specified who is entitled to recover under the plain text of the TCPA: those who received at least two calls. The jury approved recovery for such people. A court cannot distribute damages to other parties without ignoring the jury's verdict and thereby violating the Seventh Amendment.

## STANDARD OF REVIEW

This Court reviews de novo questions of law in a class action. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006) ("A district court per se abuses its discretion when it makes an error of law…."); *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 177 (4th Cir. 2019) (reviewing a "district court's legal conclusions de novo").

## ARGUMENT

I.  **The District Court Improperly Gave Nearly $11 Million In Unclaimed Judgment Funds To Uninjured Third Parties With No Legal Claim.**

The district court's award of judgment funds to uninjured third parties violates the very premise of our adversarial system: that it is a plaintiff suffering personalized injury who can recover for that injury. The district court's contrary handling of this matter was unorthodox if not absolutely unique. Following the trial, the court entered judgment in favor of a list of phone numbers, not people. *Supra* 10. As a result, the subsequent claims process served the essential function—critical under the Constitution, the TCPA, and the class definition—of determining the actual people who received those calls and therefore suffered injury and had a valid claim. But for thousands of phone calls, no valid claimant came forward. Accordingly, for the approximately $11 million corresponding to those calls, which already had been submitted to the court's registry, there is simply no identified plaintiff. Yet, instead of returning those funds to DISH, the court asserted that it had the equitable power to give that money away to twelve organizations it

deemed deserving—public-interest lawyers and computer scientists and state attorneys general, among others. *Supra* 14-15.

Disposing of the funds in this manner was contrary to law. Only a plaintiff who can demonstrate that they suffered legal injury at the hands of a defendant can obtain, from that defendant, the relief authorized by law. Absent very special circumstances not present here—a state bringing suit as *parens patriae*; a whistleblower specially authorized by statute to bring a *qui tam* suit—only the plaintiff suffering personalized injury can recover for that injury. When there is no plaintiff, there can be no recovery. In our system, "damage awards" go to particular plaintiffs; they "are not made 'in the air.'" Martin H. Redish et al., *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 Fla. L. Rev. 617, 638-39 (2010). Nothing in the law—including the doctrine of *cy pres*—authorizes taking money earmarked for a theoretical plaintiff and then, when no proper plaintiff comes forward, giving the money away. The district court's contrary conclusion contravenes this Court's precedent and violates constitutional and statutory limits on recovery.

## A.    This Court has held it "illegal" to distribute damages to uninjured non-parties.

As an initial matter, the district court's decision to transfer judgment funds to twelve uninjured third-party organizations on a "*cy pres*" theory contravenes this Court's precedent.  JA__**[Doc.620at8-12]**.

The doctrine of *cy pres*—a shortened version of a French phrase meaning "as near as possible," *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682 (8th Cir. 2002)—arose in the context of charitable trusts.  When it becomes impossible to fulfill the terms of such a trust, *Smith v. Moore*, 343 F.2d 594, 599-602 (4th Cir. 1965), *cy pres* permits funds to be put to the next-best use consistent with the donor's charitable purposes.  *See, e.g.*, *Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1, 56 (1890); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011).  That doctrine was limited to the law of trusts and estates for hundreds of years.  Redish, 62 Fla. L. Rev. at 624-30.  And it should remain so limited:  The doctrine properly "has application only to charitable trusts."  *Smith*, 343 F.2d at 601.

Recently, certain courts have extended *cy pres* to the context of class action *settlements*.  *Infra* 34-38.  This Court, however, has never

21

permitted *cy pres* redistributions to uninjured third parties in class actions—settlement or no settlement.[4]  That is because a *cy pres* award is a quintessential form of "fluid recovery," *see Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451, 455 & n.2 (D.C. Cir. 1996), which this Court has held "illegal," *Windham*, 565 F.2d at 72.  Fluid recovery describes the redistribution of awards from class members to uninjured third parties.  It occurs when (1) a "defendant's aggregate liability is determined"; (2) individual class members then have "an opportunity to collect their individual shares"; and (3) "any residue remaining after individual claims have been paid is distributed to the class' benefit under cy pres or other doctrines." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008) (internal quotation marks omitted).

This Court in *Windham* held that the use of fluid recovery in class actions is "illegal."  565 F.2d at 72 (quoting *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1018 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 156 (1974)); *see also Democratic Cent. Comm. of D.C.*, 84 F.3d

---

[4] As discussed below (at 34-39), even if *cy pres* awards were permissible in the context of settlements, they are plainly invalid in the context of a litigated judgment.

at 455 & n.2 (*cy pres* is "fluid recovery"; implementation of fluid recovery is "controversial"; and the Fourth Circuit has disallowed it). In that case, this Court rejected "fluid recovery" and affirmed the district court's denial of class certification because calculating and distributing damages would have rendered the class action unmanageable. 565 F.2d at 70, 72. Plaintiffs had argued that using a "fluid recovery" for damages would overcome those problems, and they urged a process much like the one the district court adopted here. Specifically, they asked for (1) a "trial at which time the 'gross damages' to 'the class as a whole' are assessed"; (2) a "damage fund [that would be] paid into the court"; and (3) a claims process, following which unclaimed funds would "be[] applied in some way for the benefit of the class." *Windham v. Am. Brands, Inc.*, 68 F.R.D. 641, 657 (D.S.C. 1975), *rev'd on other grounds*, 539 F.2d 1016 (4th Cir. 1976), *aff'd on reh'g*, 565 F.2d 59 (4th Cir. 1977).

Both the district court and this Court rejected that approach as "illegal … and wholly improper." 565 F.2d at 72 (quoting *Eisen*, 479 F.2d at 1018). In doing so, this Court relied on *Eisen*, which held that Rule 23 does not permit substituting the "class as a whole" for "individual members of the class." 479 F.2d at 1018. Even if Rule 23

could be read to approve such a "fantastic procedure," "courts would have to reject it as an unconstitutional violation of the requirement of due process of law." *Id.* *Windham* thus made clear that "distribut[ing] damages to unspecified parties rather than to specific class members who were actually injured … [is] an improper solution to the manageability problems of class actions." *Am. Int'l Pictures, Inc. v. Price Enterprises, Inc.*, 636 F.2d 933, 936 (4th Cir. 1980) (internal quotation marks omitted).

The district court here distinguished *Windham* on the theory that *Windham* concerned the use of fluid recovery to address manageability problems at the certification stage, whereas here, the court was using *cy pres* to address class-member identification problems at the post-judgment stage. JA__**[Doc.590at12-13]**. That distinction makes no difference. In both cases, the idea is to award damages to uninjured third parties when it is too difficult to prove individuals' entitlement to damages.[5] And the language of *Windham* applies directly here. The

---

[5] The district court also noted that *Windham* concerned fluid recovery generally rather than *cy pres* specifically. JA__**[Doc.590at13]**. That, too, is a distinction without a difference. As with *cy pres*, the proposal in *Windham* was to award damages to uninjured third parties given the difficulty proving individuals' entitlement to damages.

24

district court awarded "gross damages" to the class after trial, subject to a post-judgment process in which individuals could claim their shares. *Supra* 8-10. It then conducted a claims process, *supra* 11-12, after which it awarded unclaimed funds to uninjured non-parties "for the benefit of the class," *Windham*, 68 F.R.D. at 657. That redistribution of damages is an "improper solution" to the problem of identifying injured class members. *Am. Int'l Pictures*, 636 F.2d at 936. Uninjured non-parties are simply not entitled to damages. Under *Windham*, distributing judgment funds in this fashion was "illegal" and "wholly improper."

### B. The district court's award of judgment funds to uninjured non-parties violates the Constitution and federal law.

*Windham* got it exactly right. The district court's decision to solicit applications from third parties and award them millions of dollars in judgment funds violates the Constitution and federal law.

### 1. The *cy pres* awards violate Article III.

Article III of the Constitution "grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions."

*TransUnion*, 141 S. Ct. at 2205 (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (explaining that Article III limits federal courts to redressing a plaintiff's concrete injury that is traceable to the defendant's conduct).  Likewise, "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion*, 141 S. Ct. at 2208 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 557 U.S. 442, 466 (2016) (Roberts, C.J., concurring)).  Federal courts can provide relief only "to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm." *Tyson Foods*, 557 U.S. at 466 (Roberts, C.J., concurring) (quoting *Lewis v. Casey*, 518 U.S. 343, 349 (1996)); *see also Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 482 (5th Cir. 2011) (Jones, J., concurring) (defendants should pay only "what they owe *to the parties* in judgments or settlements" (emphasis in original)).  And courts can order relief only if it is likely to redress claimants' injuries. *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016).  "In sum, under Article III, a federal court may resolve only 'a real controversy with real impact on real persons.'" *TransUnion*, 141 S. Ct. at 2203 (*quoting Am.*

26

*Legion v. Am. Humanist Assn.*, 139 S. Ct. 2067, 2103 (2019) (Gorsuch, J., concurring in the judgment)).

The third-party payments ordered by the district court here turn Article III on its head.  As the verdict and judgment reflect, the class members suffered discrete, individual harms, not "aggregate and undifferentiated injuries."  *Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 688 (7th Cir. 2013); *supra* 7-9.  The district court thus recognized that the jury made individual awards tied to particular, violative calls, and it issued a judgment comprising individual amounts for individual potential claimants—$1200 per call that the jury found violated the TCPA.  *See* JA__**[Doc.439]** (final judgment); *see also* JA__**[Doc.292]** (verdict sheet).[6]  Accordingly, the court recognized the need to determine the "identity of the persons who received the calls," i.e., the injured individuals.  JA__**[Doc.351at7]**; *see also* JA__**[Doc.351at14]** ("Dish has an interest in not paying damages to persons who are not

---

[6] Even in a class action where a true "common fund" is created on behalf of a class—i.e., a lump sum awarded to the class as a whole rather than, as here, a collection of thousands of individual awards—the defendant retains an interest in that fund.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 481-82 & n.7 (1980); *see Van Gemert v. Boeing Co.*, 739 F.2d 730, 736-37 (2d Cir. 1984) (on remand, affirming the district court's decision to return money unclaimed from the common fund to the defendant).

proper class members, which aligns with the Court's interest in insuring that only class members receive damages awards.").

DISH is therefore liable only to individual class members for the injuries they personally suffered. Conversely, for phone calls as to which no injured party could be found, there was simply no injured party before the court. Moreover, disbursing unclaimed funds to *cy pres* beneficiaries does not remedy the privacy intrusion suffered by the recipients of violative calls, so it violates Article III's independent requirement that damages awarded be capable of redressing the individual injury. *See TransUnion*, 141 S. Ct. at 2203, 2205. Accordingly, under basic Article III principles, the funds associated with those calls must revert to DISH.

Imagine a comparable situation outside of the class action context: Daniel the Defendant hits two cars while pulling out of a parking space. Patrick the Plaintiff, the owner of one of the damaged cars, sees the whole thing. He leaves a note informing the owner of the other car that he plans to sue Daniel, but never hears back. Nevertheless, when Patrick sues Daniel, he seeks payment for the damage to *both* cars. And when Patrick wins his suit, he pockets the money intended to

compensate the other owner for the damage to that owner's car. This is obviously impermissible; Patrick cannot recover for damages to a car he does not own, and the damages allocated for the other car do not remedy the injury to Patrick's car. Nor can Patrick request that those damages be distributed to a third party—whether a favorite body shop, the American Automobile Association, or anyone else—just as an uninjured entity could not sue Daniel to recover for damages to a stranger's car in the first place. *See TransUnion*, 141 S. Ct. at 2205-06. In that situation, like here, seizing the funds and distributing them to an uninjured non-party violates basic principles of Article III.

### 2. The *cy pres* awards violate the separation of powers, the TCPA, and the Rules Enabling Act.

The district court's award of funds to uninjured third parties also is contrary to law because it goes beyond anything Congress authorized.

First and most fundamentally, under the separation of powers it is Congress, not the courts, that writes the laws and determines who can recover for legal violations. U.S. Const. art. I, § 1; *see Clinton v. City of New York*, 524 U.S. 417, 439-40 (1998). Thus, when "a statute creates a new right or offence, and provides a specific remedy or punishment, they alone apply. *Such provisions are exclusive*." *Barnet v. Muncie Nat.*

*Bank*, 98 U.S. 555, 558 (1878) (emphasis added); *see also Alexander v.*

*Sandoval*, 532 U.S. 275, 286-87 (2001) (where a statute provides no

cause of action, "courts may not create one, no matter how desirable

that be as a policy matter, or how compatible with the statute"); *Nat'l*

*R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453,

458 (1974) ("[W]hen legislation expressly provides a particular remedy

or remedies, courts should not expand the coverage of the statute to

subsume other remedies."); *Meghrig v. KFC Western, Inc.*, 516 U.S. 479,

488 (1996) ("[I]t is an elemental canon of statutory construction that

where a statute expressly provides a particular remedy or remedies, a

court must be chary of reading others into it." (alteration in original)

(internal quotation marks omitted)).

Creating new remedies is precisely what the district court did

here.  In the TCPA, Congress made clear who can recover for a

statutory violation.  Congress created a "private right of action" for

recipients of violative calls—specifically, for "[a] person who has

received more than one telephone call within any 12-month period by or

on behalf of the same entity in violation of the [Do Not Call Registry]."

47 U.S.C. § 227(c)(5).  Such an individual, Congress further specified,

30

may "recover for actual monetary loss from such a violation" or "receive up to $500 in damages for each such violation." *Id.* § 227(c)(5)(B).  In short, the TCPA "empowers each person to protect *his own personal rights*," and "affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon *their* domestic peace."[7]

Here, however, the court effectively created a new remedial scheme for distributing damages to third parties whom Congress did not authorize to recover (and who, because they are not even injured, Congress constitutionally *could not* authorize to recover).  A federal

---

[7] *Krakauer I*, 925 F.3d at 650 (emphases added); *see Parchman v. SLM Corp.*, 896 F.3d 728, 740 (6th Cir. 2018) ("[T]he purpose of the TCPA was to redress individual wrongs felt by individual consumers.… [R]ecovery under the statute runs to the harmed individual and not the public…."); *Holtzman v. Turza*, 828 F.3d 606, 608 (7th Cir. 2016) ("[S]uits under the Telephone Consumer Protection Act seek recovery for discrete wrongs to the recipients."); *cf. Leyse v. Bank of America Nat'l Ass'n*, 804 F.3d 316, 324 (3d Cir. 2015) ("Congress surely did not intend … to enable a plaintiff to sue [under the TCPA] merely because she learned that a friend or neighbor had received a robocall.").

Elsewhere, the TCPA authorizes states to bring *parens patriae* actions on behalf of state residents.  47 U.S.C. § 227(g)(1).  When a state recovers in such an action, it can distribute those funds as it sees fit—in an exercise of its executive, not judicial, authority.  Many of the calls at issue in this case were also part of a *parens patriae* action brought by states, and states have already been awarded funds for those calls. *United States v. DISH Network, LLC*, No. 3:09-3073 (C.D. Ill.).

31

court has no authority to expand recovery in this regard. On the contrary, as Professor Redish explained in his seminal article about *cy pres*, "Awarding 'damages' to an uninjured third party effectively transforms the court's function into a fundamentally executive role, because no longer is the court functioning as a judicial vehicle by which legal injuries suffered by those bringing suit are remedied. Instead, the court presides over the administrative redistribution of wealth for social good. As a result, the practice violates both the constitutional separation of powers and the case-or-controversy requirement of Article III." Redish, 62 Fla. L. Rev. at 642.

Nor can this novel remedy be justified by the fact that Krakauer pursued this lawsuit as a class action. Rule 23 does not grant courts the authority to change the scope of recovery under a federal statute. On the contrary, the Rules Enabling Act provides that the Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Accordingly, "[i]t is axiomatic that the procedural device of Rule 23 cannot be allowed to expand the substance of the claims of class members." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998); *see also Amchem*

*Products, Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (Rule 23 "must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act….").

Here, therefore, the rights and remedies cannot be greater than the ones available in an individual action under the TCPA. And no individual TCPA action could proceed in the absence of an identifiable plaintiff possessing a valid claim; there would be no injured party to compensate, and no damages for the defendant to pay. In such a case, a court could not order payment of the defendant's funds to third parties. But here, the court levied damages tied to phone numbers that were stand-ins for putative plaintiffs who never materialized. It then distributed those funds to uninjured non-parties of the court's choosing. By doing so, the district court used Rule 23 to accomplish something that would be flatly impermissible in any other type of action. This "violated the Rules Enabling Act by giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action." *Tyson Foods*, 577 U.S. at 458; *see also Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) (explaining that a class

33

action cannot "mask[] individual issues" or "eviscerate[]" a defendant's "right to raise individual challenges and defenses to claims").

## C.    Cases permitting *cy pres* awards in class settlements do not apply to litigated judgments.

As noted above, some courts have authorized *cy pres* awards following class *settlements*.  Historically, *cy pres* authorized a court to "modify a trust to best carry out the testator's intent—that is, to effectuate the 'next best' use of the gift." *Nachshin*, 663 F.3d at 1038 (citation omitted).  The courts that apply this doctrine to class action settlements analogize the settlement to a trust, funded by the defendant, for the benefit of the class.  And they reason that the intent of the settling parties can be effectuated by distributing the funds to third parties for the purported benefit of the class.  *Id*.; *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 172, 173 n.8 (3d Cir. 2013) (a district court's "certification of a settlement simply recognizes the parties' deliberate decision to bind themselves according to mutually agreed-upon terms without engaging in any substantive adjudication of the underlying causes of action" (internal quotation marks omitted)).  If the awards are too small or if the process is too complicated to justify class members' efforts to collect from the settlement fund, much of the

34

fund may remain unclaimed.[8]  Under such circumstances, those courts

reason, distributing the unclaimed funds to a third-party organization

will "put the unclaimed fund to its next best compensation use."

*Nachshin*, 663 F.3d at 1038 (citation omitted).

Conversely, other authorities recognize that analogizing class

action settlements to trusts is fundamentally "strained," Newberg

§ 12:32, and "inherently dubious," *Klier*, 658 F.3d at 480 (Jones, J.,

concurring), and they question whether distributing funds to non-class

members in fact benefits the class, *Mirfasihi v. Fleet Mortg. Corp.*, 356

F.3d 781, 784 (7th Cir. 2004) ("There is no indirect benefit to the class

from the defendant's giving the money to someone else.").  There are

"fundamental concerns surrounding the use of [cy pres] in class action

litigation, including when, *if ever*, such relief should be considered."

---

[8] Here, however, neither of those conditions holds true.  The court awarded $1,200 per violative phone call and little effort was required: The court adopted a bare-bones claim form that did not require any supporting documentation, nor require claimants to have received any calls, but instead required only that they—or any member of their household—used a phone number that received calls.  And, for more than 11,000 putative class members, the court did not require claim forms at all.  *Supra* 11.

*Marek v. Lane*, 571 U.S. 1003 (2013) (Roberts, C.J., statement respecting denial of cert.) (emphasis added).

But even if such fluid distributions were permissible in this Circuit following *settlement*—which they are not, *see supra* 21-25—"precedents involving [fluid class recovery in the context of] settlements are of little help when a case has been litigated through trial to judgment." *Van Gemert v. Boeing Co.*, 573 F.2d 733, 736 (2d Cir. 1978), *vacated on reh'g on other grounds*, 590 F.2d 433 (1978) (en banc), *aff'd*, 444 U.S. 472 (1980); *accord Eisen*, 479 F.2d at 1012; *City of Philadelphia v. Am. Oil Co.*, 53 F.R.D. 45, 71 (D.N.J. 1971); *see generally* 2 McLaughlin on Class Actions § 8:16 (17th ed.) ("[N]o post-*Eisen* Second Circuit case has upheld a fluid recovery outside of the settlement context."). For that reason, even courts that permit *cy pres* for settlements have recognized that using it in litigated judgments would be "controversial," *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 34 (1st Cir. 2009), and have expressed "skepticism" about its legality, *In re Baby Prod. Antitrust Litig.*, 708 F.3d at 172 n.7.

With good reason. A litigated judgment is entirely different from a settlement. After all, "a district court may 'provide[] broader relief [in

an action that is resolved before trial] than the court could have awarded after a trial.'  Indeed, … some 'fluidity' is permissible *in the distribution of settlement proceeds*."  *Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 185 (2d Cir. 1987) (emphasis added) (internal citation omitted); *see generally Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522-23 (1986) (the "limitations [that] Congress placed in [a statute] on the power of federal courts to impose obligations … do not apply when the obligations are created by a consent decree" because "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations").  By contrast, when a case has been litigated to judgment, nothing resembling a trust is created.  The defendant does not voluntarily provide money for the benefit of the class as a whole, and there is no donor's "intent" to consider.

Rather, the intent that matters is Congress's intent (as expressed in the statute and in the remedies it created), and the jury's intent, as expressed in the verdict.  For that reason, extending *cy pres* from the settlement context to litigated judgment funds also would violate the Seventh Amendment.  The Seventh Amendment requires damages to be

37

assigned and determined by a jury. *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 320-21 (5th Cir. 1998). And it precludes a court "from replacing an award of compensatory damages with one of the court's own choosing." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007); *see Kennon v. Gilmer*, 131 U.S. 22, 28-29 (1889) (a court violates the Seventh Amendment when it replaces the jury's assessment of damages with its own).[9] Here, pursuant to the jury instructions, the jury found DISH liable to people who "had their residential numbers on the National Do Not Call Registry" and who "received at least two calls within a 12-month period." JA__**[Doc.293at3]**. Redistributing funds to uninjured third parties is inconsistent with that verdict and, therefore, with the Seventh Amendment.

Instead, the funds are owed to the identified class members, and *only* to the identified class members. If a plaintiff cannot be ascertained or found, or for any reason does not or cannot recover, then there simply

---

[9] This foundational principle, like the others discussed above, holds equally true in a class action. *Cimino*, 151 F.3d at 312. "'The Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action,' and 'nothing turns now upon the form of the action or the procedural devices by which the parties happen to come before the court.'" *Id.* at 311 (quoting *Ross v. Bernhard*, 396 U.S. 531, 538, 540 (1970)).

is no valid judgment on their behalf.  And a court has no authority

under the TCPA, under the Rules Enabling Act, or under the

Constitution, to creatively reimagine a remedy.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district

court's decisions awarding unclaimed funds *cy pres* and require

unclaimed funds to revert to DISH.

August 9, 2021

Respectfully submitted,

*/s/ Eric A. Shumsky*

| | |
|---|---|
| E. Joshua Rosenkranz | Eric A. Shumsky |
| Peter A. Bicks | Sarah H. Sloan |
| Elyse D. Echtman | ORRICK, HERRINGTON & |
| ORRICK, HERRINGTON & | SUTCLIFFE LLP |
| SUTCLIFFE LLP | 1152 15th Street |
| 51 West 52nd Street | Washington, DC  20005 |
| New York, NY  10019 | (202) 339-8400 |
| (212) 506-5000 | |

Paul David Meyer
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105
(415) 773-5700

*Counsel for Defendant-Appellant*

## ORAL ARGUMENT STATEMENT

In light of the nature and complexity of issues raised, DISH believes that oral argument would assist the Court in resolving the appeal and respectfully requests the opportunity to present oral argument.

# CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and 4th Cir. R. 32(b) because this brief contains 7,761 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Eric A. Shumsky*
Eric A. Shumsky
*Counsel for Defendant-Appellant*

## ADDENDUM OF STATUTES AND REGULATIONS

47 U.S.C § 227 .......................................................................1a

## 47 U.S. Code § 227 - Restrictions on use of telephone equipment

(a) Definitions

As used in this section—

(1) The term "automatic telephone dialing system" means equipment which has the capacity—

(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

(B) to dial such numbers.

(2) The term "established business relationship", for purposes only of subsection (b)(1)(C)(i), shall have the meaning given the term in section 64.1200 of title 47, Code of Federal Regulations, as in effect on January 1, 2003, except that—

(A) such term shall include a relationship between a person or entity and a business subscriber subject to the same terms applicable under such section to a relationship between a person or entity and a residential subscriber; and

(B) an established business relationship shall be subject to any time limitation established pursuant to paragraph (2)(G)).

(3) The term "telephone facsimile machine" means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

(4) The term "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or

services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.

(5) The term "unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

(b) Restrictions on use of automated telephone equipment

(1) Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

(i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

(ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or

any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B);

(C) to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless—

(i) the unsolicited advertisement is from a sender with an established business relationship with the recipient;

(ii) the sender obtained the number of the telephone facsimile machine through—

(I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

(II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution,

except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile

machine number of the recipient before July 9, 2005; and

(iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),

except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E); or

(D) to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

(2) Regulations; exemptions and other provisions

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

(A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

(B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

(i) calls that are not made for a commercial purpose; and

(ii) such classes or categories of calls made for commercial purposes as the Commission determines—

4a

(I) will not adversely affect the privacy rights that this section is intended to protect; and

(II) do not include the transmission of any unsolicited advertisement;

(C) may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect;

(D) shall provide that a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if—

(i) the notice is clear and conspicuous and on the first page of the unsolicited advertisement;

(ii) the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful;

(iii) the notice sets forth the requirements for a request under subparagraph (E);

(iv) the notice includes—

(I) a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and

5a

(II) a cost-free mechanism for a recipient to transmit a request pursuant to such notice to the sender of the unsolicited advertisement; the Commission shall by rule require the sender to provide such a mechanism and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are unduly burdensome given the revenues generated by such small businesses;

(v) the telephone and facsimile machine numbers and the cost-free mechanism set forth pursuant to clause (iv) permit an individual or business to make such a request at any time on any day of the week; and

(vi) the notice complies with the requirements of subsection (d);

(E) shall provide, by rule, that a request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if—

(i) the request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

(ii) the request is made to the telephone or facsimile number of the sender of such an unsolicited advertisement provided pursuant to subparagraph (D)(iv) or by any other method of communication as determined by the Commission; and

(iii) the person making the request has not, subsequent to such request, provided express invitation or

6a

permission to the sender, in writing or otherwise, to
send such advertisements to such person at
such telephone facsimile machine;

(F) may, in the discretion of the Commission and subject to
such conditions as the Commission may prescribe, allow
professional or trade associations that are tax-exempt
nonprofit organizations to send unsolicited
advertisements to their members in furtherance of the
association's tax-exempt purpose that do not contain the
notice required by paragraph (1)(C)(iii), except that
the Commission may take action under this subparagraph
only—

(i) by regulation issued after public notice and
opportunity for public comment; and

(ii) if the Commission determines that such notice
required by paragraph (1)(C)(iii) is not necessary to
protect the ability of the members of such associations
to stop such associations from sending any
future unsolicited advertisements;

(G) (i) may, consistent with clause (ii), limit the duration of
the existence of an established business relationship,
however, before establishing any such limits,
the Commission shall—

(I) determine whether the existence of the
exception under paragraph (1)(C) relating to
an established business relationship has resulted
in a significant number of complaints to
the Commission regarding the sending
of unsolicited advertisements to telephone
facsimile machines;

(II) determine whether a significant number of
any such complaints involve unsolicited

7a

advertisements that were sent on the basis of an established business relationship that was longer in duration than the Commission believes is consistent with the reasonable expectations of consumers;

(III) evaluate the costs to senders of demonstrating the existence of an established business relationship within a specified period of time and the benefits to recipients of establishing a limitation on such established business relationship; and

(IV) determine whether with respect to small businesses, the costs would not be unduly burdensome; and

(ii) may not commence a proceeding to determine whether to limit the duration of the existence of an established business relationship before the expiration of the 3-month period that begins on July 9, 2005;

(H) may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States; and

(I) shall ensure that any exemption under subparagraph (B) or (C) contains requirements for calls made in reliance on the exemption with respect to—

(i) the classes of parties that may make such calls;

(ii) the classes of parties that may be called; and

(iii) the number of such calls that a calling party may make to a particular called party.

8a

(3) Private right of action

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

(4) Civil forfeiture

(A) In general

Any person that is determined by the Commission, in accordance with paragraph (3) or (4) of section 503(b) of this title, to have violated this subsection shall be liable to the United States for a forfeiture penalty pursuant to section 503(b)(1) of this title. Paragraph (5) of section 503(b) of this title shall not apply in the case of a violation of this subsection. A forfeiture penalty under this subparagraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this subparagraph shall be determined in accordance

9a

with subparagraphs (A) through (F) of section 503(b)(2) of this title.

(B) Violation with intent

Any person that is determined by the Commission, in accordance with paragraph (3) or (4) of section 503(b) of this title, to have violated this subsection with the intent to cause such violation shall be liable to the United States for a forfeiture penalty pursuant to section 503(b)(1) of this title. Paragraph (5) of section 503(b) of this title shall not apply in the case of a violation of this subsection. A forfeiture penalty under this subparagraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this subparagraph shall be equal to an amount determined in accordance with subparagraphs (A) through (F) of section 503(b)(2) of this title plus an additional penalty not to exceed $10,000.

(C) Recovery

Any forfeiture penalty determined under subparagraph (A) or (B) shall be recoverable under section 504(a) of this title.

(D) Procedure

No forfeiture liability shall be determined under subparagraph (A) or (B) against any person unless such person receives the notice required by section 503(b)(3) of this title or section 503(b)(4) of this title.

(E) Statute of limitations

Notwithstanding paragraph (6) of section 503(b) of this title, no forfeiture penalty shall be determined or imposed against any person—

10a

(i) under subparagraph (A) if the violation charged occurred more than 1 year prior to the date of issuance of the required notice or notice of apparent liability; or

(ii) under subparagraph (B) if the violation charged occurred more than 4 years prior to the date of issuance of the required notice or notice of apparent liability.

(F) Rule of construction

Notwithstanding any law to the contrary, the Commission may not determine or impose a forfeiture penalty on a person under both subparagraphs (A) and (B) based on the same conduct.

(c) Protection of subscriber privacy rights

(1) Rulemaking proceeding required

Within 120 days after December 20, 1991, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. The proceeding shall—

(A) compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific "do not call" systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such privacy rights, and in terms of their cost and other advantages and disadvantages;

(B) evaluate the categories of public and private entities that would have the capacity to establish and administer such methods and procedures;

(C) consider whether different methods and procedures may apply for local telephone solicitations, such as local telephone solicitations of small businesses or holders of second class mail permits;

(D) consider whether there is a need for additional Commission authority to further restrict telephone solicitations, including those calls exempted under subsection (a)(3) of this section, and, if such a finding is made and supported by the record, propose specific restrictions to the Congress; and

(E) develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section.

(2) Regulations

Not later than 9 months after December 20, 1991, the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers.

(3) Use of database permitted

The regulations required by paragraph (2) may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase. If the Commission determines to require such a database, such regulations shall—

(A) specify a method by which the Commission will select an entity to administer such database;

(B) require each common carrier providing telephone exchange service, in accordance with regulations prescribed by the Commission, to inform subscribers for telephone exchange service of the opportunity to provide notification, in accordance with regulations established under this paragraph, that such subscriber objects to receiving telephone solicitations;

(C) specify the methods by which each telephone subscriber shall be informed, by the common carrier that provides local exchange service to that subscriber, of (i) the subscriber's right to give or revoke a notification of an objection under subparagraph (A), and (ii) the methods by which such right may be exercised by the subscriber;

(D) specify the methods by which such objections shall be collected and added to the database;

(E) prohibit any residential subscriber from being charged for giving or revoking such notification or for being included in a database compiled under this section;

(F) prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database;

(G) specify (i) the methods by which any person desiring to make or transmit telephone solicitations will obtain access to the database, by area code or local exchange prefix, as required to avoid calling the telephone numbers of subscribers included in such database; and (ii) the costs to be recovered from such persons;

(H) specify the methods for recovering, from persons accessing such database, the costs involved in

identifying, collecting, updating, disseminating, and selling, and other activities relating to, the operations of the database that are incurred by the entities carrying out those activities;

(I) specify the frequency with which such database will be updated and specify the method by which such updating will take effect for purposes of compliance with the regulations prescribed under this subsection;

(J) be designed to enable States to use the database mechanism selected by the Commission for purposes of administering or enforcing State law;

(K) prohibit the use of such database for any purpose other than compliance with the requirements of this section and any such State law and specify methods for protection of the privacy rights of persons whose numbers are included in such database; and

(L) require each common carrier providing services to any person for the purpose of making telephone solicitations to notify such person of the requirements of this section and the regulations thereunder.

(4) Considerations required for use of database method

If the Commission determines to require the database mechanism described in paragraph (3), the Commission shall—

(A) in developing procedures for gaining access to the database, consider the different needs of telemarketers conducting business on a national, regional, State, or local level;

(B) develop a fee schedule or price structure for recouping the cost of such database that recognizes such differences and—

14a

(i) reflect the relative costs of providing a national, regional, State, or local list of phone numbers of subscribers who object to receiving telephone solicitations;

(ii) reflect the relative costs of providing such lists on paper or electronic media; and

(iii) not place an unreasonable financial burden on small businesses; and

(C) consider (i) whether the needs of telemarketers operating on a local basis could be met through special markings of area white pages directories, and (ii) if such directories are needed as an adjunct to database lists prepared by area code and local exchange prefix.

(5) Private right of action

A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State—

(A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and

procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection. If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

(6) Relation to subsection (b)

The provisions of this subsection shall not be construed to permit a communication prohibited by subsection (b).

(d) Technical and procedural standards

(1) Prohibition

It shall be unlawful for any person within the United States—

(A) to initiate any communication using a telephone facsimile machine, or to make any telephone call using any automatic telephone dialing system, that does not comply with the technical and procedural standards prescribed under this subsection, or to use any telephone facsimile machine or automatic telephone dialing system in a manner that does not comply with such standards; or

(B) to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual.

(2) Telephone facsimile machines

The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which is manufactured after one year after December 20, 1991, clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business, other entity, or individual sending the message, and the telephone number of the sending machine or of such business, other entity, or individual.

(3) Artificial or prerecorded voice systems

The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that—

> (A) all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business, other entity, or individual; and

> (B) any such system will automatically release the called party's line within 5 seconds of the time notification is transmitted to the system that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

(e) Prohibition on provision of misleading or inaccurate caller identification information

> (1) In general

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within

17a

the United States, in connection with any voice service or text messaging service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value, unless such transmission is exempted pursuant to paragraph (3)(B).

(2) Protection for blocking caller identification information

Nothing in this subsection may be construed to prevent or restrict any person from blocking the capability of any caller identification service to transmit caller identification information.

(3) Regulations

    (A) In general

    The Commission shall prescribe regulations to implement this subsection.

    (B) Content of regulations

        (i) In general

        The regulations required under subparagraph (A) shall include such exemptions from the prohibition under paragraph (1) as the Commission determines is appropriate.

        (ii) Specific exemption for law enforcement agencies or court orders

        The regulations required under subparagraph (A) shall exempt from the prohibition under paragraph (1) transmissions in connection with—

            (I) any authorized activity of a law enforcement agency; or

(II) a court order that specifically authorizes the use of caller identification manipulation.

(4) Repealed. Pub. L. 115–141, div. P, title IV, § 402(i)(3), Mar. 23, 2018, 132 Stat. 1089

(5) Penalties

(A) Civil forfeiture

(i) In general

Any person that is determined by the Commission, in accordance with paragraphs (3) and (4) of section 503(b) of this title, to have violated this subsection shall be liable to the United States for a forfeiture penalty. A forfeiture penalty under this paragraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this paragraph shall not exceed $10,000 for each violation, or 3 times that amount for each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $1,000,000 for any single act or failure to act.

(ii) Recovery

Any forfeiture penalty determined under clause (i) shall be recoverable pursuant to section 504(a) of this title. Paragraph (5) of section 503(b) of this title shall not apply in the case of a violation of this subsection.

(iii) Procedure

No forfeiture liability shall be determined under clause (i) against any person unless such person receives the

notice required by section 503(b)(3) of this title or section 503(b)(4) of this title.

(iv) 4-year statute of limitations

No forfeiture penalty shall be determined or imposed against any person under clause (i) if the violation charged occurred more than 4 years prior to the date of issuance of the required notice or notice or apparent liability.

(B) Criminal fine

Any person who willfully and knowingly violates this subsection shall upon conviction thereof be fined not more than $10,000 for each violation, or 3 times that amount for each day of a continuing violation, in lieu of the fine provided by section 501 of this title for such a violation. This subparagraph does not supersede the provisions of section 501 of this title relating to imprisonment or the imposition of a penalty of both fine and imprisonment.

(6) Enforcement by States

(A) In general

The chief legal officer of a State, or any other State officer authorized by law to bring actions on behalf of the residents of a State, may bring a civil action, as parens patriae, on behalf of the residents of that State in an appropriate district court of the United States to enforce this subsection or to impose the civil penalties for violation of this subsection, whenever the chief legal officer or other State officer has reason to believe that the interests of the residents of the State have been or are being threatened or adversely affected by a violation of this subsection or a regulation under this subsection.

20a

(B) Notice

The chief legal officer or other State officer shall serve written notice on the Commission of any civil action under subparagraph (A) prior to initiating such civil action. The notice shall include a copy of the complaint to be filed to initiate such civil action, except that if it is not feasible for the State to provide such prior notice, the State shall provide such notice immediately upon instituting such civil action.

(C) Authority to intervene

Upon receiving the notice required by subparagraph (B), the Commission shall have the right—

    (i) to intervene in the action;

    (ii) upon so intervening, to be heard on all matters arising therein; and

    (iii) to file petitions for appeal.

(D) Construction

For purposes of bringing any civil action under subparagraph (A), nothing in this paragraph shall prevent the chief legal officer or other State officer from exercising the powers conferred on that officer by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(E) Venue; service or process

    (i) Venue

    An action brought under subparagraph (A) shall be brought in a district court of the United States that

meets applicable requirements relating to venue under section 1391 of title 28.

(ii) Service of process

In an action brought under subparagraph (A)—

(I) process may be served without regard to the territorial limits of the district or of the State in which the action is instituted; and

(II) a person who participated in an alleged violation that is being litigated in the civil action may be joined in the civil action without regard to the residence of the person.

(7) Effect on other laws

This subsection does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

(8) Definitions

For purposes of this subsection:

(A) Caller identification information
The term "caller identification information" means information provided by a caller identification service regarding the telephone number of, or other information regarding the origination of, a call made using a voice service or a text message sent using a text messaging service.

(B) Caller identification service

The term "caller identification service" means any service or device designed to provide the user of the service or device with the telephone number of, or other information regarding the origination of, a call made using a voice service or a text message sent using a text messaging service. Such term includes automatic number identification services.

(C) Text message

The term "text message"—

> (i) means a message consisting of text, images, sounds, or other information that is transmitted to or from a device that is identified as the receiving or transmitting device by means of a 10-digit telephone number or N11 service code;
>
> (ii) includes a short message service (commonly referred to as "SMS") message and a multimedia message service (commonly referred to as "MMS") message; and
>
> (iii) does not include—
>
> > (I) a real-time, two-way voice or video communication; or
> >
> > (II) a message sent over an IP-enabled messaging service to another user of the same messaging service, except a message described in clause (ii).

(D) Text messaging service

The term "text messaging service" means a service that enables the transmission or receipt of a text

message, including a service provided as part of or in connection with a voice service.

(E) Voice service

The term "voice service"—

(i) means any service that is interconnected with the public switched telephone network and that furnishes voice communications to an end user using resources from the North American Numbering Plan or any successor to the North American Numbering Plan adopted by the Commission under section 251(e)(1) of this title; and

(ii) includes transmissions from a telephone facsimile machine, computer, or other device to a telephone facsimile machine.

(9) Limitation

Notwithstanding any other provision of this section, subsection (f) shall not apply to this subsection or to the regulations under this subsection.

(f) Effect on State law

(1) State law not preempted

Except for the standards prescribed under subsection (d) and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—

(A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

24a

(B) the use of automatic telephone dialing systems;

(C) the use of artificial or prerecorded voice messages; or

(D) the making of telephone solicitations.

(2) State use of databases

If, pursuant to subsection (c)(3), the Commission requires the establishment of a single national database of telephone numbers of subscribers who object to receiving telephone solicitations, a State or local authority may not, in its regulation of telephone solicitations, require the use of any database, list, or listing system that does not include the part of such single national database that relates to such State.

(g) Actions by States

(1) Authority of States

Whenever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls or other transmissions to residents of that State in violation of this section or the regulations prescribed under this section, the State may bring a civil action on behalf of its residents to enjoin such calls, an action to recover for actual monetary loss or receive $500 in damages for each violation, or both such actions. If the court finds the defendant willfully or knowingly violated such regulations, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under the preceding sentence.

(2) Exclusive jurisdiction of Federal courts

The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia shall have exclusive jurisdiction over all civil

25a

actions brought under this subsection. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this section or regulations prescribed under this section, including the requirement that the defendant take such action as is necessary to remove the danger of such violation. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

(3) Rights of Commission

The State shall serve prior written notice of any such civil action upon the Commission and provide the Commission with a copy of its complaint, except in any case where such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Commission shall have the right (A) to intervene in the action, (B) upon so intervening, to be heard on all matters arising therein, and (C) to file petitions for appeal.

(4) Venue; service of process

Any civil action brought under this subsection in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the violation occurred or is occurring, and process in such cases may be served in any district in which the defendant is an inhabitant or where the defendant may be found.

(5) Investigatory powers

For purposes of bringing any civil action under this subsection, nothing in this section shall prevent the attorney general of a State, or an official or agency designated by a State, from exercising the powers conferred on the attorney general or such official by the laws of such State to conduct investigations or to

administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(6) Effect on State court proceedings

Nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such State.

(7) Limitation

Whenever the Commission has instituted a civil action for violation of regulations prescribed under this section, no State may, during the pendency of such action instituted by the Commission, subsequently institute a civil action against any defendant named in the Commission's complaint for any violation as alleged in the Commission's complaint.

(8) "Attorney general" defined

As used in this subsection, the term "attorney general" means the chief legal officer of a State.

(h) Annual report to Congress on robocalls and transmission of misleading or inaccurate caller identification information

(1) Report required

Not later than 1 year after December 30, 2019, and annually thereafter, the Commission, after consultation with the Federal Trade Commission, shall submit to Congress a report regarding enforcement by the Commission of subsections (b), (c), (d), and (e) during the preceding calendar year.

(2) Matters for inclusion

Each report required by paragraph (1) shall include the following:

(A) The number of complaints received by
the Commission during each of the preceding 5 calendar
years, for each of the following categories:

> (i) Complaints alleging that a consumer received a call
> in violation of subsection (b) or (c).

> (ii) Complaints alleging that a consumer received a call
> in violation of the standards prescribed under
> subsection (d).

> (iii) Complaints alleging that a consumer received a
> call in connection with which misleading or
> inaccurate caller identification information was
> transmitted in violation of subsection (e).

(B) The number of citations issued by
the Commission pursuant to section 503(b) of this
title during the preceding calendar year to enforce
subsection (d), and details of each such citation.

(C) The number of notices of apparent liability issued by
the Commission pursuant to section 503(b) of this
title during the preceding calendar year to enforce
subsections (b), (c), (d), and (e), and details of each such
notice including any proposed forfeiture amount.

(D) The number of final orders imposing forfeiture penalties
issued pursuant to section 503(b) of this title during the
preceding calendar year to enforce such subsections, and
details of each such order including the forfeiture imposed.

(E) The amount of forfeiture penalties or criminal fines
collected, during the preceding calendar year, by
the Commission or the Attorney General for violations of
such subsections, and details of each case in which such a
forfeiture penalty or criminal fine was collected.

(F) Proposals for reducing the number of calls made in violation of such subsections.

(G) An analysis of the contribution by providers of interconnected VoIP service and non-interconnected VoIP service that discount high-volume, unlawful, short-duration calls to the total number of calls made in violation of such subsections, and recommendations on how to address such contribution in order to decrease the total number of calls made in violation of such subsections.

(3) No additional reporting required

The Commission shall prepare the report required by paragraph (1) without requiring the provision of additional information from providers of telecommunications service or voice service (as defined in section 227b(a) of this title).

(i) Information sharing

(1) In general

Not later than 18 months after December 30, 2019, the Commission shall prescribe regulations to establish a process that streamlines the ways in which a private entity may voluntarily share with the Commission information relating to—

(A) a call made or a text message sent in violation of subsection (b); or

(B) a call or text message for which misleading or inaccurate caller identification information was caused to be transmitted in violation of subsection (e).

(2) Text message defined

29a

In this subsection, the term "text message" has the meaning given such term in subsection (e)(8).

(j) Robocall blocking service

    (1) In general

    Not later than 1 year after December 30, 2019, the Commission shall take a final agency action to ensure the robocall blocking services provided on an opt-out or opt-in basis pursuant to the Declaratory Ruling of the Commission in the matter of Advanced Methods to Target and Eliminate Unlawful Robocalls (CG Docket No. 17–59; FCC 19–51; adopted on June 6, 2019)—

        (A) are provided with transparency and effective redress options for both—

            (i) consumers; and

            (ii) callers;

        (B) are provided with no additional line item charge to consumers and no additional charge to callers for resolving complaints related to erroneously blocked calls; and

        (C) make all reasonable efforts to avoid blocking emergency public safety calls.

    (2) Text message defined

In this subsection, the term "text message" has the meaning given such term in subsection (e)(8).

30a

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on August 9, 2021.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

/s/ Eric A. Shumsky

Eric A. Shumsky
*Counsel for Defendant-Appellant*